UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RICHARD SIPE,

                                        Plaintiff,

            vs.                                                    9:08-CV-1365
                                                                    (FJS/ATB)
DAVID HARDER, *et al.*,

                                        Defendants.
_____

RICHARD SIPE, Plaintiff pro se
AARON J. MARCUS, Asst. Broome County Attorney, Attorney for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

        This matter has been referred to me for Report and Recommendation by the

Honorable Frederick J. Scullin, Jr., Senior United States District Judge, pursuant to 28

U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).[1]

        In this civil rights complaint, plaintiff alleges that on October 4, 2008, while he

was incarcerated in the Broome County Correctional Facility ("BCCF"), he was

assaulted by another inmate, while the housing unit officer watched. (Compl. at 2)[2]

(Dkt. No. 1).  Plaintiff also alleges that he was denied his "constitutional right" to

press charges against the inmate, denied his right to file a grievance against another

officer, and suffered retaliation as a result of these actions. *Id.*  Plaintiff seeks

_____

        [1]The case was originally referred to the Honorable Gustave J. Di Bianco and was assigned to
me upon Judge Di Bianco's retirement on January 4, 2010. (Dkt. No. 41).

        [2] The court will cite to pages of the CM/ECF document because plaintiff has not numbered his
pages and has inserted pages into the civil rights complaint form.

substantial monetary relief. (Compl. at 6).  Presently before the court is defendants'
motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 43).  Plaintiff
has responded in opposition to the motion,[3] and defendants have filed a reply. (Dkt.
Nos. 47, 48).

This court agrees that defendants have met their burden on summary judgment
and finds that there is no genuine issue of material fact for trial on any of plaintiff's
claims.  Plaintiff has failed to exhaust his administrative remedies as to all of the
grounds raised in his complaint.  None of the defendants were responsible for the
assault on plaintiff, defendants Petryszyn[4] and Brown did not violate any of plaintiff's
constitutional rights, and defendant Kozina did not deny plaintiff's request for medical
care or retaliate against plaintiff for the assertion of his constitutional rights.  Thus, the
court will recommend that defendants' motion for summary judgment be granted and
the complaint dismissed in its entirety.

## DISCUSSION

I. **Facts**

A. **Plaintiff's Allegations**

Plaintiff alleges that on October 4, 2008, he was incarcerated in B-pod[5] at

---

[3] Although plaintiff has labeled this document a "motion," it is more appropriately considered
a response in opposition to defendants' motion and has been filed as such. (Dkt. No. 47).

[4] In the complaint, plaintiff misspelled this defendant's name "Petrician." (Dkt. No. 1).
However, the court will refer to this defendant with the proper spelling, "Petryszyn."  *See* (Dkt.
No. 43-7) (Petryszyn Aff.).

[5] A "pod" is a housing unit at the facility.

BCCF.[6] (Compl. at 2).  At approximately 9:30 p.m., plaintiff was assaulted by Fruquan Mable,[7] another inmate at the jail. *Id.*  Plaintiff claims that Corrections Officer, Matt Rovente[8] allowed the assault to continue for approximately twelve minutes. *Id.* Plaintiff claims that he was "badly hurt," and he was "taken to medical," where he was treated.  *Id.*  Plaintiff claims that he was later placed in punitive housing for no reason, and that there were cameras that "saw the whole thing." *Id.*

Plaintiff then states that on October 5th, he "stayed in medical" because he was having headaches, he could not sleep, and he was having panic attacks and bad dreams as a result of the assault. (Compl. at 4).  Plaintiff alleges that he was in the medical unit for two days. *Id.*  On October 7, 2008, defendant Sergeant Petryszyn came to speak with plaintiff about the assault, but plaintiff claims that defendant Petryszyn refused to let plaintiff file criminal charges against the inmate who assaulted him. *Id.* Plaintiff states that he is suing Sergeant Petryszyn because it is plaintiff's constitutional right to file criminal charges against another individual. *Id.*

Plaintiff states that he was moved to A-Pod on the same day that he spoke with Sergeant Petryszyn.  Plaintiff claims that on October 8, 2008, he tried to file a grievance against Sergeant Petryszyn, but that defendant Officer Billy Brown would

---

[6] Plaintiff was incarcerated at BCCF from September 9, 2008, until February 3, 2009. (Dkt. No. 43-9, Smolinsky Aff. ¶ 4).

[7] Plaintiff originally named Fruquan Mable as a defendant, but on January 6, 2009, Senior District Judge Scullin dismissed the complaint against defendant Marble because he did not act under color of state law as required to sustain a section 1983 action. (Dkt. No. 6 at 3).  Although plaintiff continues to refer to Fruquan Mable as a defendant, he has been terminated from this action.

[8] Plaintiff has not named Officer Rovente as a defendant in this case.

not let him do so because defendants Brown and Petryszyn were friends. *Id.* Plaintiff states that he is suing defendant Brown based on his failure to allow plaintiff to file a grievance. *Id.* Plaintiff claims that defendant Officer Larry Kozina denied plaintiff's request for medical care in retaliation for "the trouble [plaintiff] stirred up" with his grievances and due to his request to press charges against the other inmate. *Id.*

Very liberally interpreted, plaintiff's complaint appears to allege four claims.[9]

(1)      Defendant Harder is responsible for a "lack of security" that caused plaintiff to be assaulted by another inmate.

(2)      Defendant Petryszyn failed to allow plaintiff to "press criminal charges" against the inmate who assaulted him.

(3)      Defendant Brown denied plaintiff the right to file a grievance against Sergeant Petryszyn.

(4)      Defendant Kozina retaliated against plaintiff by denying his request for medical care and by treating him in a harsh and racist manner.[10]

---

[9]In determining the claims that plaintiff is attempting to raise, the defendants and the court have considered the entire complaint because plaintiff's "Causes of Action" do not all appear to actually state causes of action. Where a plaintiff is proceeding pro se, the court must interpret the pleadings liberally "to raise the strongest arguments they suggest." *Bussey v. Phillips*, 419 F. Supp. 2d 569, 579 (S.D.N.Y. 2006) (quoting *Graham v. Henderson* 89 F.3d 75, 79 (2d Cir. 1996) (internal quotation marks omitted)).

[10] The court notes that in plaintiff's response to defendants' summary judgment motion plaintiff lists his "causes of action" as defendants have interpreted them, but plaintiff includes an additional statement in his fourth cause of action relating to a "denial of the right to practice his religion." (Dkt. No. 47, ¶ 9). Plaintiff then states that "[w]hen [the] complaint was received by defendants, Retaliation was placed on plaintiff by locking him in F pod with no heat, no hot water, denial of medical care, and refusal to allow plaintiff to practice his religion of Islam." (Dkt. No. 47, ¶ 11). He also states that "[p]laintiff was placed in F pod in retaliation for "suit." (Dkt. No. 47, ¶ 20). Plaintiff appears to be attempting to state that after the defendants received the ***federal complaint***, "they" did all these things to plaintiff. Nowhere in the complaint are any facts that support these final allegations, and it appears that they relate to actions that some unknown individuals committed after the federal complaint was filed. Plaintiff has not moved to supplement his complaint. Thus, the court will not consider any of these last allegations.

## B.    Defendants' Evidence

Along with counsel's affidavit and the required statement of material facts, defendants have each filed an affidavit in support of their summary judgment motion. (Dkt. No. 43-2, 43-5-43-8).  Defendants have also filed the following in support of their motion:

(1)    The affidavits of Corrections Officers Joe Cornwell and Dave Creveling, two officers who responded to the October 4, 2008 incident involving plaintiff. (Dkt. Nos. 43-3, 43-4).

(2)    The affidavit of Mark Smolinsky, the Jail Administrator of BCCF. (Dkt. No. 43-9).

Officer Rovente states that on October 4, 2008, he was working in B-pod, plaintiff's housing unit at BCCF. (Dkt. No. 43-8, Rovente Aff. ¶ 3).  At approximately 9:35 p.m., he heard the door to cell 104 slam, and as he walked over to see what was happening, he noticed that inmate Mable was following plaintiff from the lower tier of cells. *Id.* ¶ 4.  As Officer Rovente was watching, inmate Mable began to hit plaintiff. *Id.*  Officer Rovente states that corrections officers are trained to handle such altercations by first notifying the control room of the fight in progress, referred to as calling a "code yellow." *Id.* ¶ 5 & 5(a).  The "code yellow" involves informing the control room where the incident is taking place and how many inmates are involved. *Id.* ¶ 5(a).

Next, the officers are told to maintain unit security by ordering a "lock in" and by ordering the fighting inmates to stop. *Id.* ¶ 5(b).  The officers are instructed not to become directly involved in the disturbance, but to remain at a "safe tactical distance."

5

*Id.* ¶ 5(c).  In fact, as the pod officer, Officer Rovente was not even allowed to assist in the restraining process after the other officers arrived. *Id.* ¶ 7.  Officer Rovente states that when he saw inmate Mable hitting plaintiff, he immediately ordered inmate Mable to stop fighting and used his shoulder radio unit to call the "code yellow." *Id.* ¶ 8.  Officer Rovente then went back to the "bubble" and called for the rest of the unit inmates to "lock in." *Id.* at ¶ 9.  He did not try to physically stop the fight himself because, according to his training, he was required to wait until other officers arrived to assist. *Id.* ¶ 8.

Officer Rovente states that at a certain point, inmate Mable stopped hitting plaintiff and returned to his cell, where he locked in. *Id.* ¶ 9.  Officer Rovente then ordered plaintiff into the program room to wait for the other guards to arrive.  When the other guards arrived, they took both inmates out of the pod. *Id.* ¶ 10.  According to Officer Rovente, the entire incident lasted less than one minute, and although inmate Mable threw a lot of punches, it appeared that plaintiff was struck only three or four times because he was running away from inmate Mable and dodging the punches. *Id.* ¶ 11.  Officer Rovente asserts that prior to this altercation, he was not aware of any tension or other problems between plaintiff and inmate Mable. *Id.* ¶ 12.

Officers Cornwell and Creveling were "rovers" on the evening of October 4, 2008. (Dkt. No. 43-3 & 43-4) (Cornwell Aff.; Creveling Aff.)  A "zone rover" is an officer who monitors inmate movement through the corridors of the facility and assists and relieves housing officers when needed. (Cornwell Aff. ¶ 2; Creveling Aff. ¶ 2).  Zone rovers also respond to emergency situations in the housing pods, including the

6

"code yellow" calls. *Id.*  Both officers state that at approximately 9:35 p.m. on October 4, 2008, a "code yellow" call was made regarding a fight in B-pod. (Cornwell Aff. ¶ 3; Creveling Aff. ¶ 3).  Officer Cornwell states that he does not recall exactly how long it took him to respond, but that generally it takes him from a few seconds to about one minute, depending on where he is in the facility. (Cornwell Aff. ¶ 3).  Officer Creveling also states that he does not remember how long it took him to respond, but it generally takes between one to two minutes, depending upon where he is in the facility. (Creveling Aff. ¶ 3).

Officers Cornwell and Creveling state that by the time they arrived at B-pod, both inmates had already been secured. (Cornwell Aff. ¶ 4; Creveling Aff. ¶ 4).  When the officers arrived, they were directed to cell 102, where inmate Mable was already locked in. *Id.*  Plaintiff was located in the program room. *Id.*  Officer Cornwell secured inmate Mable, and Sergeant Jeff Katen and Officer Creveling escorted inmate Mable out of the pod. (Cornwell Aff. ¶ 5; Creveling Aff. ¶ 5).  Sergeant Theresa Zenzel and Officer James McCombs took plaintiff out of B-Pod. (Cornwell Aff. ¶ 5).  Officer Creveling states that he and Jeff Katan took inmate Mable to D-Pod, and while inmate Mable was being searched, he admitted to hitting plaintiff because plaintiff spit on the back of inmate Mable's head. (Creveling Aff. ¶ 6).  Officers Cornwell and Creveling have attached copies of their respective incident reports as exhibits to their affidavits.[11] (Dkt. No. 43-15 – Ex. C, Cornwell Report; Dkt. No. 43-16 – Ex. D,

---

[11] Defendants have also included a copy of Officer McCombs's report. (Dkt. No. 43-17 – Ex. E, McCombs Report).

Creveling Report).  Officer Rovente's report states that plaintiff was seen by the medical staff after the incident for the injury to his mouth. (Dkt. No. 43-14, Ex. B).

In his affidavit, defendant Petryszyn states that he investigated the altercation between plaintiff and inmate Mable. (Dkt. No. 43-7, Petryszyn Aff. ¶ 2).  As part of the investigation, he reviewed a videotape of the incident, taken by the cameras positioned in the pod. *Id.*  Defendant Petryszyn states that his review of the videotape revealed that inmate Mable did strike plaintiff "a few times," but that no more than a few seconds elapsed, as opposed to the ten or twelve minutes that plaintiff claims passed. *Id.* ¶ 3.  Because of the "de minimis" nature of the event, the videotape was not retained beyond the normal thirty day holding period. *Id.* ¶ 4.  No "Notice of Claim" or civil complaint was filed at the time that the recorder "rewrote itself." *Id.*

Defendant Petryszyn also states that Officer Rovente did not stand idly by, watching plaintiff's beating. *Id.* ¶ 5.  Defendant Petryszyn confirms that when a disturbance takes place in the pod, the pod officer must call the "code yellow," maintain unit security and order a "lock in" of the rest of the inmates on the unit, and must not get physically involved in the altercation. *Id.* at ¶ 7.  The reason for this final requirement is so that the pod officer can identify the inmates involved, observe and document all actions, and maintain the security of the rest of the unit by avoiding being ambushed or tricked. *Id.*  Defendant Petryszyn determined that Officer Rovente handled the situation properly and in accordance with policy. *Id.* at ¶ 12.  It took the "rovers" between thirty seconds and one minute to respond to the "code yellow" call. *Id.* ¶ 13.

Defendant Petryszyn states that he never refused to allow plaintiff to bring criminal charges against inmate Mable, although defendant Petryszyn does not remember plaintiff asking to do so. *Id.* ¶¶ 14-15.  Defendant Petryszyn states that he does not have the power to restrict an inmate from pursuing the filing of criminal charges, and plaintiff could have notified the Broome County District Attorney's Office himself in order to request that charges be brought against inmate Mable. *Id.* ¶ 16.

Defendants have also "traditionally" filed plaintiff's medical records.[12] (Dkt. No. 43-25, Exs. L, M).  In plaintiff's response to defendants' motion, he argued that the records provided by defendants were not complete, and that defendants refused to give plaintiff a list of witnesses to the event. (Dkt. No. 47 at 4).  Defendants' reply includes excerpts from plaintiff's deposition. (Dkt. No. 48-1).  Defendants have also included the medical records associated with medical visits from October 4 through 7, 2008. (Dkt. No. 48-2).

The progress notes from October 4th indicate that plaintiff was taken to the medical department after the fight.  The nurse noticed that plaintiff's nose had bled, but the blood was "drying." *Id.* at 1.  There was a small line of bruising seen on the left side of the nose, his eyes were tearful and reddened, and he complained of dizziness and blurred vision. *Id.*  The nurse tested his eye sight, determined that he was alert and oriented, and performed a neurological check that produced results that

---

[12] Exhibit 25, filed electronically, is simply defense counsel's letter, requesting that he be allowed to file the medical records "traditionally." (Dkt. No. 43-25).  The court has been provided hard copies of the medical records for its review.

were within normal limits. *Id.* The nurse did not notice any cuts or "open areas" outside of the bloody nose. *Id.* at 1.

Because plaintiff complained of dizziness and chest pain, an EKG was performed. *Id.* at 1, 3.  Although plaintiff complained of increased anxiety, his anxiety and heart rate decreased while he was being examined, and the EKG was normal. *Id.* at 1. After discussing potential cardiac issues, plaintiff was returned to the housing unit. *Id.*  Plaintiff went to "emergency sick call" on October 5, 2008, complaining that he was having feelings of "harming self." *Id.*  Plaintiff told the nurse that "he didn't do anything and they put me in D-Pod, so I came over here." *Id.* at 2.  He denied suicidal intent, but he was kept in the medical unit. *Id.*  His main complaint was that his nose hurt across the bridge, and he was having trouble blowing out of it. *Id.*

With their reply, defendants submitted the affidavit of Stephen A. Barlow, a Corrections Sergeant and Supervisor of the Criminal Investigations Unit at BCCF. (Dkt. No. 48-4, Barlow Aff. ¶ 1).  Sergeant Barlow interviewed Inmate Arthur Pellechia, who admitted being an eyewitness to the entire October 4, 2008 incident. *Id.* Inmate Pellechia, states that he saw the fight, which started in the Gallery. *Id.*  Inmate Pellechia states that he saw plaintiff running away from Fruquan, and that plaintiff "took some punches," but that the "whole thing lasted about 5 mins." *Id.*  "The officer called lock in when it started and called for help." *Id.*

## II.  **Summary Judgment**

Defendants have moved for summary judgment, arguing that plaintiff has failed to exhaust his administrative remedies and has failed to raise any genuine issue of

material fact regarding any of his substantive claims.  This court finds that summary judgment should be granted in favor of all defendants, based both on plaintiff's failure to exhaust his administrative remedies and as to the merits of his claims.

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273.  In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In considering a motion for summary judgment, the court does not resolve contested issues of fact, but must rather determine the existence of any disputed issues

of material fact. *Salahuddin v. Coughlin*, 999 F.2d 526, 535 (2d Cir. 1998) (citations omitted).  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.  To evaluate a fact's materiality, the substantive law determines which facts are critical and which are irrelevant. *Salahuddin v. Coughlin*, 999 F.2d at 535 (citing *Anderson v. Liberty Lobby*, 477 U.S. at 248).  While the court must extend "extra consideration" to pro se parties, this does not relieve the pro se of his duty to meet the requirements necessary to defeat the motion. *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).  A pro se party's bald assertion, "completely unsupported by the evidence," is not sufficient to overcome a properly supported motion. *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y.  1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## III.   <u>Exhaustion of Administrative Remedies</u>

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal action.  This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675. The failure to exhaust is an affirmative defense that must be raised by the defendants.

*Scott v. Del Signore*, 2005 U.S. Dist. LEXIS 6070, *12-15 (W.D.N.Y. Feb. 18, 2005) (citing *inter alia Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004)).  As an affirmative defense, it is the defendant's burden to establish that plaintiff failed to meet the exhaustion requirements. *Id.* at *12-13 (citing *Giano,* 380 F.3d at 675).

In *Jones v. Bock*, 549 U.S. 199, 218 (2007), the Supreme Court held that in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Id.* (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the inmate must ***complete*** the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

Plaintiff was incarcerated in a County Facility, thus, the court must examine the grievance procedures applicable to BCCF. Major Smolinsky's affidavit states that he is the Corrections Facility Administrator, and he promulgates and reviews the rules and regulations of jail procedure. (Dkt. No. 43-9, Smolinsky Aff. ¶ 2).  Upon admission to the facility, all inmates are provided with an Inmate Handbook, which advises them as to the availability of grievance forms. *Id.*  The forms were readily available so that inmates could file their grievances within five days of the act or occurrence giving rise to the grievance. *Id.*  The handbook also provides the proper deadlines pursuant to New York Regulations. *Id.* (citing 9 N.Y. Code Rules & Regs. ("NYCRR") §§ 7032.4 (i)-(k) and 7032.5).  All inmates are provided access to the grievance program. *Id.* ¶ 6.

Defendants have included a page of the handbook, containing the description of the inmate grievance procedure used at BCCF. (Dkt. No. 43-18, Ex. F).  In order to resolve a grievance, the inmate must first attempt to get the issue resolved with the housing officer. *Id.*  If no resolution is reached, plaintiff must file his grievance within five business days. *Id.*  The initial grievance should be filed with defendant Brown, the Grievance Coordinator at BCCF.[13] (Dkt. No. 43-2, Brown Aff. ¶¶ 1, 3).  The grievance is investigated, and plaintiff receives a written determination from defendant Brown within five days. *Id.*  If plaintiff is not satisfied with the result, he may appeal to the Corrections Facility Administrator (Major Smolinsky). *Id.*  If the inmate is not satisfied with this result, he must appeal within three days, and the grievance will be sent to the State Commission of Correction. *Id.*

The Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir, 2004)).  The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *Id.*

---

[13]  Defendant Brown states that as part of his duties as the Grievance Coordinator, he tours the facility daily, Monday through Friday, discussing facility issues with inmates and accepting their grievances, if any. (Dkt. No. 43-2, Brown Aff. ¶ 3).  Defendant Brown states that he knows plaintiff, has spoken to him on various occasions, and has received two grievances from him. *Id.* ¶ 4.

14

## A.    Failure to Protect

Based on Major Smolinsky's affidavit and Exhibit F, it is clear that administrative remedies were available to plaintiff.[14]  It is also clear that there is no record of plaintiff bringing an initial grievance regarding the failure to protect him from inmate Mable's assault, either against Officer Rovente, who plaintiff has not named as a defendant, or against defendant Sheriff Harder, who was not personally involved in the incident, but upon whom the plaintiff apparently wishes to blame the assault.  There is no claim that anyone prevented plaintiff from filing a grievance about the assault itself.  Thus, the defendants would not be estopped from asserting this defense.  Plaintiff has shown no special circumstances that would excuse his failure to grieve the alleged failure to protect plaintiff.  Thus, plaintiff's first claim may be dismissed because he did not exhaust his administrative remedies.

## B.    Failure to Allow Plaintiff to Press Criminal Charges and Right to File Grievances

Plaintiff second claim alleges that defendant Petryszyn refused to allow plaintiff to press criminal charges against inmate Mable.  The grievance procedure was certainly available to plaintiff, but plaintiff did not file a grievance against defendant Petryszyn.  For this claim, plaintiff alleges that he "filed or tried to file a grievance" against defendant Petryszyn, but defendant Brown "denied [his] grievance" because the defendants were "friends."  Plaintiff alleges this as a separate claim against

---

[14] It is clear that plaintiff had the Inmate Handbook, since his November 21, 2008 letter to Major Smolinsky cites the Inmate Hanbook and "NYS Minimum Standards" as support for plaintiff's alleged right to visitation. (Dkt. No. 43-21, Defs. Ex. I).

defendant Brown.

Plaintiff appears to be alleging that defendant Brown somehow prevented plaintiff from filing a grievance against defendant Petryszyn.  Since defendant Brown states in his affidavit that part of his job is to collect the initial grievances from inmates, (Brown Aff. ¶ 3), if he did prevent plaintiff from filing a grievance against defendant Petryszyn, plaintiff could argue that defendant Brown's conduct should estop him from asserting the lack of exhaustion as a defense.

However, even assuming that defendant Brown would not accept plaintiff's initial grievance against defendant Petryszyn, plaintiff was able to submit a complaint about both defendant Brown and defendant Petryszyn.  On November 21, 2008 plaintiff wrote a letter to Major Smolinsky.[15] (Dkt. No. 43-21, Ex. I).  In that letter, plaintiff stated that he wished to file a grievance regarding visitation, but that defendant Brown "stopped allowing me to file them." *Id.*  Plaintiff claimed that the visitation was denied "in retaliation" for an unspecified lawsuit.[16]  It is unclear from plaintiff's letter when defendant Brown allegedly stopped allowing plaintiff to file grievances.  Plaintiff also included his claim that defendant Petryszyn refused to allow plaintiff to file criminal charges against inmate Mable and included a non-specific

---

[15] Plaintiff wrote substantially the same letter to Sheriff Harder. (Dkt. No. 43-20, Ex. H).

[16] Plaintiff may be referring to this action because his complaint is signed was November 12, 2008, and the letters defendant Harder and Major Smolinsky were written on November 21, 2008, it is unlikely that any of the defendants were aware of plaintiff's lawsuit because it was not received in the Northern District until December 22, 2008, notice of the action was not sent to Sheriff Harder until January 16, 2009, and the case was not served on defendants until March of 2009.  The acknowledgments of service were not returned until July of 2009. (Dkt. Nos. 31-34).

claim that his "medical care" was denied. *Id.*

In his affidavit, Major Smolinsky states that when he received plaintiff's Novmeber 21st letter,[17] he directed Lieutenant Hill to investigate the matter and respond. (Dkt. No. 43-9, ¶ 9).  Lieutenant Hill investigated plaintiff's complaints and responded by memorandum dated December 4, 2008. (Dkt. No. 43-22, Ex. J). Lieutenant Hill's memorandum denied plaintiff's complaints. *Id.*  The memorandum addresses and denies any staff wrongdoing regarding the visitation/retaliation claim, the claim against defendant Petryszyn, and defendant Brown, even though plaintiff's November 21st letter does not specify what grievances defendant Brown stopped plaintiff from filing.  Lieutenant Hill's memorandum also cites all of the instances in which plaintiff was examined by medical personnel. *Id.*  Plaintiff never attempted to appeal this determination to the Commission of Correction.

If plaintiff were following the grievance procedure as stated in the Inmate Handbook, the first level would have required a decision by defendant Brown.  If defendant Brown were preventing plaintiff from filing grievances, an appeal to Major Smolinsky would have been the second level of review, and the final appeal would have been the Commission of Correction.  Plaintiff bypassed[18] defendant Brown by writing to Major Smolinsky and Sheriff Harder, and although plaintiff received a

---

[17] Major Smolinsky received plaintiff's letter on December 1, 2008. (Dkt. No. 43-9, ¶ 9).

[18] Generally, bypassing the first step of the grievance process would not be considered properly exhausting the grievance process. *Jones v. Bock, supra.*  However, if defendant Brown had really been preventing plaintiff from filing grievances, plaintiff's letter to Major Smolinsky (and Sheriff Harder) would have been the appropriate step to take.

decision from Lieutenant Hill on behalf of Major Smolinsky, plaintiff never appealed or even attempted to appeal Lieutenant Hill's findings.  To the extent that plaintiff began the available administrative process, he never completed it. Therefore, he has failed to exhaust his administrative remedies as to both his claim against defendant Petryszyn and his claim against defendant Brown.

In the alternative, as discussed below, even if the court were to assume that plaintiff exhausted his administrative remedies, neither claim rises to the level of a constitutional violation, and both claims may be dismissed on the merits.

### C.    Retaliation

Plaintiff alleges that defendant Kozina "retaliated" against plaintiff for the "trouble" he "stirred up" by denying his "request for medical care. (Compl. at 4). Defendants have included two formal grievances filed by plaintiff; one filed on November 3, 2008 against Officer Kozina, claiming that defendant Kozina made plaintiff take his medication by threatening him with confinement if he refused to comply; and the second, filed on January 14, 2009, complaining about an unnamed officer who was very rude and who was shouting plaintiff's "legal business" in the open. (Dkt. Nos. 43-19, 43-23, Exs. G, K).  Both grievances were addressed and denied at each level of the appeal process. *Id.*

However, the grievance that actually mentioned defendant Kozina did not allege that he refused plaintiff's request for medical care.  In fact, plaintiff's grievance complaint against defendant Kozina was that he told plaintiff that he had to take his medications as directed or plaintiff would be locked in his cell. (Dkt. No. 43-19, Ex.

G).  Nowhere in the grievance does plaintiff claim that he requested medical care that he did not receive.[19]  The grievance was filed on November 3, 2008, long after the October 4th incident, and before plaintiff signed or filed his federal complaint. *Id.*  Thus, no claim of retaliation against defendant Kozina has been exhausted by plaintiff.  In any event, as with plaintiff's other claims, his claim against defendant Kozina fails on the merits.

## IV.  **Personal Involvement**

Defendants argue that defendant Harder, the Sheriff of Broome County, was not personally involved in any of the conduct alleged by plaintiff, and that plaintiff's claim that defendants failed to protect him from the attack of another inmate fails on the merits.  Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)(citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

---

[19] The court notes that the grievance was investigated.  The investigation showed that plaintiff wanted to take medications "his way," not as prescribed by the doctor. (Dkt. No. 43-19, Ex. G at 3-4). Defendant Kozina only got involved because plaintiff was having an argument with the nurse and was beginning to disrupt the housing unit. *Id.* at 4.  The nurse was interviewed as part of the investigation. Defendant Kozina told plaintiff to stop arguing "or be locked in." *Id.*  The investigation also showed that defendant Kozina declined to look at pictures of plaintiff's children, and plaintiff took offense. *Id.*  Lieutenant Hill wrote plaintiff a memorandum explaining the results of the investigation and denying the grievance. *Id.*  Plaintiff appealed to the Commission of Correction, and his appeal was denied January 21, 2009.

A supervisory official is personally involved if that official directly participated in the infraction.  *Id.*  The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong.  *Id.*  Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue.  *Id.*  Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event.  *Id.  See also Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

In this case, defendant Harder argues that plaintiff has failed to allege sufficient personal involvement to sustain a constitutional claim against him.  Plaintiff states that he named Sheriff Harder because of a lack of security at the facility that allegedly resulted in the assault by inmate Mable.  Plaintiff does not allege that Sheriff Harder was personally responsible for any other conduct.  Plaintiff's general statement that defendant Harder was responsible because of a "lack of security" alleges neither a policy or a custom of allowing such attacks, nor does he allege gross negligence in managing Officer Rovente.

Plaintiff was deposed in this action.  The deposition focused on the danger from inmate Mable.  In their reply brief, defendants have filed portions of plaintiff's deposition. (Dkt. No. 48-1).  During his deposition, plaintiff testified that he had never had any misunderstandings with inmate Mable prior to the incident, but he then

20

attempted to explain why he feared this inmate. (Dkt. No. 48-1 at 2).[20]   Plaintiff was

asked why he did not have inmate Mable on a "keep-apart list" prior to the incident,

and plaintiff stated that he "did have, the day before the altercation . . . I let the

[corrections officers] know . . . ." *Id.*  Letting corrections officers know about a

potential enemy the day before an altercation is insufficient to establish that somehow

defendant Harder would be aware of the situation.  Later in the deposition, plaintiff

testified that prior to the altercation, he had no problem with inmate Mable. *Id.* at 4.

Plaintiff stated that "[w]e were cool in the cell until he got the word."[21] *Id.*

Plaintiff was asked how Sheriff Harder was involved in the altercation or what

happened prior to the altercation. *Id.* at 8.  Plaintiff answered that Sheriff Harder was

involved because plaintiff "wrote him" the day before the altercation. *Id.*  There is

absolutely no basis upon which to find that Sheriff Harder knew about any danger to

plaintiff, particularly when plaintiff states he had no problem with inmate Mable prior

to the incident, and he did not "alert" either the corrections officers or defendant

Harder until the day before the incident.[22]  In any event, the failure of a supervisory

official to investigate a letter of protest written by an inmate is insufficient to establish

---

[20] Defendants did not submit a copy of the entire deposition, thus, the pages of the transcript are not consecutive.  The court will cite to the CM/ECF page of the document.

[21] During the deposition, plaintiff testified that inmate Mable had a "contract" out on plaintiff, due to another inmate, who was on plaintiff's "keep-apart" list. (Dkt. No. 48-1 at 2).  "[T]hat's why I was assaulted." *Id.*  Plaintiff also testified that he put inmate Mable on plaintiff's "keep-apart" list "the day before the altercation" because he "felt bad vibes . . . ." *Id.*

[22] The only letter to Sheriff Harder from plaintiff in the record is the letter, filed by defendants, dated November 21, 2008 (after the October 4th incident) that is substantially identical to the letter plaintiff wrote to Major Smolinsky. (Dkt. No 43-20).  The claims made in that letter were investigated by Lieutenant Hill.

personal involvement.  *Smart v. Goord*, 441 F. Supp. 2d 631, 642-643 (S.D.N.Y. 2006).  Thus, to the extent that plaintiff claims that Sheriff Harder should have done something to protect plaintiff from inmate Mable's assault itself, there is no personal involvement.

The court must interpret plaintiff's pro se complaint as raising the strongest argument that it suggests. *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).  Very liberally construed, the complaint can be read as including two failure to protect claims.  One claim includes the failure to anticipate the risk of, and protect plaintiff from, assault by inmate Mable.  The second claim would be that Officer Rovente watched the altercation without "helping" plaintiff.  Plaintiff does not name Officer Rovente as a defendant.  Because plaintiff was unaware of the proper protocol for responding to inmate altercations, he does not appear to be challenging the "policy" or the "protocol" which requires the housing officer to refrain from physically interfering in an inmate altercation and waiting for the "code yellow" back-up to arrive. However, if the court interprets the complaint as including a challenge to the "policy" or official "protocol" of the facility, and Sheriff Harder was involved in creating or enforcing that policy, then there could arguably be sufficient personal involvement by defendant Harder for that claim alone. The court does not have to make this determination, because regardless of personal involvement, plaintiff's failure to protect claims fail on the merits as discussed below.

V.   **Failure to Protect**

An inmate has a right under the Eighth and Fourteenth Amendments to be

spared "the 'unnecessary and wanton infliction of pain.'" *Hendricks v. Coughlin*, 942 F.2d 109, 112 (2d Cir. 1991) (citation omitted). An inmate's allegation that a defendant was deliberately indifferent in failing to protect him from the violence of other inmates states a claim under section 1983. *Id.* at 113.

In order to establish an Eighth Amendment claim for failure to protect, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, ***and*** prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The plaintiff must show that prison officials ***actually knew of and disregarded*** an excessive risk of harm to the inmate's health and safety. *Id.* at 837. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists, and the defendant must also draw that inference. *Id.*

An isolated omission by corrections officers generally does not support a claim for deliberate indifference, absent circumstances involving evil intent, recklessness, or deliberate indifference. *Coronado v. Goord*, 99 Civ. 1674, 2000 U.S. Dist. LEXIS 13876, *10-11 (citing *Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985)). Plaintiff may allege a constitutional claim by alleging that the substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and that the officials being sued were exposed to information concerning the risk and thus, must have known about it. *Id.* (citing *Farmer*, 511 U.S. at 842-43).

As stated above, even assuming that plaintiff wrote to Sheriff Harder the day before the incident, this bit of information is completely insufficient to establish that

23

Sheriff Harder was aware of and disregarded a substantial risk to plaintiff.  Thus, to the extent that plaintiff is attempting to raise a claim of failure to protect him from the assault itself against Sheriff Harder,[23] that claim may be dismissed.

Plaintiff's claim that Sheriff Harder was responsible for a lack of security in general would also not rise to the level of a constitutional claim.  Such conclusory allegations are insufficient to state a claim under section 1983. *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987).  Negligence is also not actionable under section 1983. *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).

Finally, to the extent that plaintiff's complaint may be read to challenge the policy or "protocol" that prevents the housing officer from becoming physically involved in an inmate altercation and requires him to wait for back-up to arrive, that claim also fails on the merits.  It is well settled that the realities of running a penal institution are "complex and difficult," and the policies instituted by prison administrators are entitled to great deference by the court. *Washington v. Harper*, 494 U.S. 210, 223-24 (1990).  The Supreme Court standard for evaluating any regulation that infringes upon an inmate's constitutional rights involves determining whether the

---

[23] A claim against Sheriff Harder or any of the other defendants in their "official capacities," would be a suit against the municipality by which the individual is employed.  A section 1983 action against municipal officers in their official capacity is treated as an action against the municipality itself. *Coon v. Town of Springfield*, 404 F.3d 683, 687 (2d Cir. 2005)(citing *Brandon v. Holt*, 469 U.S. 464, 471-73 (1985)).  In order to state a claim against Broome County, plaintiff would have to show that the allegedly unconstitutional conduct resulted from a "policy" or "custom" of the municipality. *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003).  Since the case fails against the individual defendants for lack of a constitutional violation, any claim against the municipality would also be dismissed.  This court has also discussed plaintiff's complaint as it could be interpreted to allege a challenge to a policy, and finds that the complaint should be dismissed either as against the defendants in their individual or "official" capacities.

regulation or policy is "'reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner v. Safely*, 482 U.S. 78, 89 (1987)).  The standard applies even when the constitutional right allegedly infringed is fundamental. *Id.* (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)).  In order to make this determination, the court must consider whether there is a vital connection between the policy and the legitimate governmental interest supporting the policy; the impact that any accommodation of the constitutional right will have on guards and other inmates, and on the allocation of prison resources in general; and the absence of ready alternatives. *Id.*

In this case, although plaintiff believes that Officer Rovente failed to intervene in the fight to help plaintiff, the evidence submitted by defendants shows that Officer Rovente did exactly as he should have in the situation.  It may have appeared to plaintiff that Officer Rovente was standing by while plaintiff was being assaulted.  As stated above, however, the officers have been trained not to become involved in an inmate altercation.  They must wait for back-up to protect the security of the entire housing unit.  Officer Rovente immediately called for back up, and within minutes, officers arrived.  It may have seemed a long time to plaintiff, but in reality, only one or two minutes passed, and according to inmate Pellechia, the "whole thing" only lasted five minutes.

The policy articulated by defendants to explain Officer Rovente's actions is certainly related to legitimate penological interests.  The security risk of the only officer on a housing unit becoming involved in an inmate altercation is substantial for

25

the guard as well as the rest of the inmates in the unit. The "code yellow" is called, and the rovers arrive within seconds or minutes to assist in ending the disturbance. Although plaintiff may believe that this was not the proper procedure, the defendants have advanced a very legitimate security reason for the protocol followed by Officer Rovente, and plaintiff's substantive claims of failure to protect may be dismissed.

## VII.   Criminal Charges and Grievances

### A.   Defendant Petryszyn

The source of some frustration for plaintiff appears to be his belief that defendant Petryszyn refused to allow plaintiff to press criminal charges against inmate Mable. Plaintiff asserts that he has some constitutional right to press charges against another individual, and that this defendant prevented plaintiff from doing so. Although defendant Petryszyn denies refusing to *allow* plaintiff to press charges, stating that plaintiff could have always contacted the District Attorney himself, there simply is no constitutional right to press charges against another individual. *Marsh v. Kirschner*, 31 F. Supp. 2d 79, 81 (D. Conn. 1998) (citing *inter alia Leeke v. Timmerman*, 454 U.S. 83, 87 (1981) (per curiam); *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). *See also Bourguignon v. Lantz*, No. 3:05-CV-245, 2006 WL 214009, *6-7 (D. Conn. Jan. 25, 2006) (citations omitted) (no right to compel the prosecution of criminal activity, and court dismissed plaintiffs' claims that defendants failed to press charges or failed to assist other inmates in pressing charges against inmates involved in an altercation). Thus, even if defendant Petryszyn had refused to allow or help plaintiff to press charges against inmate Mable, plaintiff's claim against

26

defendant Petryszyn would have to be dismissed.

### B.   Defendant Brown

Plaintiff alleges that defendant Brown refused to allow plaintiff to file a

grievance against defendant Petryszyn, complaining about his failure to allow plaintiff

to press criminal charges against inmate Mable.  To the extent that this allegation

could have excused a failure to exhaust, it is discussed above.  The court also

interprets plaintiff complaint as an attempt to bring a separate constitutional claim

against defendant Brown for his alleged refusal to allow plaintiff to file an

institutional grievance against his "friend" defendant Petryszyn.

Courts have consistently held that because grievances procedures are

undertaken voluntarily by the New York and other states, they are ***not constitutionally***

***required***. *See Ramos v. Hanslmaier*, 96 Civ. 744, 1997 U.S. Dist. LEXIS 6082, *6-7

(S.D.N.Y. Feb. 19, 1997) (multiple citations omitted). *See also Bullock v. Horn,* CV-

99-1402, 2000 U.S. Dist. LEXIS 21573, *22-23 (M.D. Pa. 2000) (plaintiff claimed

improper refusal to process grievance); *Hoover v. Watson*, 886 F. Supp. 410, 418-19

(D. Del.), *aff'd*, 74 F.3d 1226 (3d Cir. 1995); *Muhammad v. McMickens*, 86 Civ. 7376,

1988 U.S. Dist. LEXIS 552, *8-9 (S.D.N.Y. Jan. 25, 1988).  Because the grievance

procedures are not constitutionally required, a violation of those procedures, or the

failure to enforce them, does not give rise to a claim under section 1983. *Id.*  Thus,

plaintiff's claim against defendant Brown may be dismissed.

### VIII.  Retaliation

Plaintiff's final claim is that defendant Kozina retaliated against plaintiff for the

27

grievance and the "pressing charges ordeal" by subjecting plaintiff to "harsh and racist treatment." (Compl. at 4, 5).  As stated above, plaintiff vaguely states that the alleged retaliation included some denial of medical treatment.  Plaintiff's claims are completely conclusory and unsupported by any of the evidence.

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)).  The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)).  Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett*, 343 F.3d at 137.

The Second Circuit has defined "adverse action" in the prison context, as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003), *superseded by* 2003 U.S. App. LEXIS 13030 (2d Cir. Feb. 10, 2003)) (omission in original).  This objective test applies even if the plaintiff was not himself subjectively

28

deterred from exercising his rights. *Id.*

In this case, plaintiff alleges that defendant Kozina retaliated against plaintiff for the assertion of his right to have criminal charges filed against inmate Mable and his right to file a grievance against defendant Petryszyn.  Even assuming that plaintiff has validly asserted that he engaged in constitutionally protected conduct, there is no indication that defendant Kozina took any "adverse" action against plaintiff or that any action taken by defendant Kozina was in any way related to the assertion of plaintiff's alleged constitutional rights.

Plaintiff does not describe any instance in which defendant Kozina denied plaintiff's request for medical care.[24]  In his complaint plaintiff states that he filed a grievance against defendant Kozina for this conduct.  Thus, the court has examined the grievance filed by plaintiff against defendant Kozina in order to determine what plaintiff might be claiming.  As stated above, the only grievance plaintiff filed against defendant Kozina   involved defendant Kozina telling plaintiff to stop arguing with a nurse, who was telling plaintiff to take his medications as prescribed by medical personnel, and to stop disrupting the housing unit.  Plaintiff does not describe what he means by "harsh and racist treatment," and this court cannot find that any such "treatment" would deter a similarly situated individual of ordinary firmness from

---

[24] In response to plaintiff's claim that he has been denied medical care, defendants have submitted plaintiff's medical records for this court's review. (Dkt. No. 43, Exs. L, M).  In his response to defendants' motion, plaintiff still makes vague claims regarding his medical care, but he does not relate this allegations to any existing defendant.  As stated above, any attempt that plaintiff makes to include new issues regarding religion or any other claims will not be considered.

exercising his constitutional rights.[25]  Thus, this court will recommend dismissal of the conclusory claim of retaliation as to defendant Kozina.

      **WHEREFORE**, based on the findings above, it is

      **RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 43) be **GRANTED**, and the complaint be **DISMISSED IN ITS ENTIRETY**.

      Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated: August 4, 2010

                                        **Hon. Andrew T. Baxter**
                                        **U.S. Magistrate Judge**

---

[25] *See, e.g, Davis v. Goord*, 320 F.3d at 353 (insulting, disrespectful, sarcastic, or hostile comments directed at an inmate generally do not rise to the level of adverse action) (citing *inter alia, Dawes v. Walker*, 239 F.3d at 492 (calling inmate a "rat" not a constitutional violation).